1
2
3
4
5
6
7
8                       IN THE UNITED STATES DISTRICT COURT
9                    FOR THE NORTHERN DISTRICT OF CALIFORNIA
10
11   PEOPLE OF THE STATE OF CALIFORNIA,          No. C06-05755 MJJ
12              Plaintiff,                        **ORDER GRANTING DEFENDANTS'
                                                  MOTION TO DISMISS**
13       v.
14   GENERAL MOTORS CORPORATION, ET
     AL.,
15
                Defendants.
16   _____/
17
18                               **INTRODUCTION**
19        Before the Court is Defendants General Motors Corp.; Toyota Motor North America, Inc.;
20   Ford Motor Co., American; Honda Motor Co., Inc; Daimler Chrysler Corp.; and Nissan North
21   America, Inc.'s (collectively, "Defendants" or "Automakers") Motion to Dismiss for Lack of
22   Subject Matter Jurisdiction and Failure to State a Claim Upon Which Relief May be Granted.[1]
23   Plaintiffs, the People of the State of California, *ex rel*. Edmund G. Brown Jr., Attorney General
24   ("Plaintiff" or "the State of California" or "Attorney General") oppose the motion.  For the
25   following reasons, the Court **GRANTS** Defendants' motion.
26                           **FACTUAL BACKGROUND**
27        In this action, the State of California seeks damages against various automakers for creating,
28   and contributing to, an alleged public nuisance – global warming.  The material allegations as taken

_____
[1]Docket No. 33.

1   from the operative complaint are as follows.

2          "Global warming is a 'change of climate which is attributed directly or indirectly to human

3   activity that alters the composition of the global atmosphere and which is in addition to natural

4   climate variability observed over comparable time periods.'" (Second Am. Compl. ("SAC") ¶ 22.)

5   (citation omitted.)  According to Plaintiff, the "[s]cientific debate is over" and "there is a clear

6   scientific consensus that global warming has begun and that most of the current global warming is

7   caused by emissions of greenhouse gasses, primarily carbon dioxide from fossil fuel combustion."

8   (*Id*. at ¶ 23.)  Global warming occurs when energy from the sun heats the Earth, which radiates the

9   energy into the Earth's atmosphere.  (*Id*. at ¶ 28.)  Carbon dioxide traps the heat in the Earth's

10  atmosphere that would otherwise escape into space.  (*Id*.)

11         Carbon dioxide is the most significant greenhouse gas emitted by human activity.  (*Id*. at ¶

12  27.)  The six Defendant automakers produce vehicles that emit over 289 million metric tons of

13  carbon dioxide.  (*Id*. at ¶ 40.)  These emissions constitute over twenty percent of human-generated

14  carbon dioxide emission in the United States.  (*Id*.)  Defendants' carbon dioxide emissions account

15  for over thirty percent of such emissions in California.  (*Id*.)  Human-induced emissions of carbon

16  dioxide, such as those from motor vehicles, are causing global warming.  (*Id*. at ¶ 19.)

17         Plaintiff has expended millions of dollars to study, plan for, monitor, and respond to impacts

18  already caused, and likely to occur, as a result of global warming.  (*Id*. at ¶ 44.)  The impacts of

19  global warming have resulted in an increase in the winter average temperatures in the Sierra Nevada

20  region, causing a reduction in the snow pack which serves as thirty-five percent of the State's water.

21  (*Id*. at ¶¶ 47-48.)  Additionally, as a result of the increased temperatures, the snow pack melts earlier

22  in the Spring resulting in increased risk of flooding within the State.  (*Id*. at ¶ 51.)  Global warming

23  has also resulted in rising sea levels that have increased erosion along California's 1,075 miles of

24  coastline.  (*Id*. at ¶ 52.)  Other impacts of global warming include increases in the frequency and

25  duration of extreme heat events, and increases in the risk and intensity of wildfires, among others.

26  (*Id*. at 55-56.)

27         Plaintiff asserts two causes of action in the operative complaint: (1) public nuisance under

28  federal common law; and, alternatively, (2) public nuisance under California Law, California Civil

*United States District Court*
For the Northern District of California

2

Code § 3479, *et seq*. and California Civil Code § 731.  Plaintiff seeks to hold each Defendant jointly and severally liable for creating, contributing to, and maintaining a public nuisance.  Plaintiff requests monetary damages, attorneys' fees, and declaratory judgment for future monetary expenses and damages incurred by the State of California in connection with the nuisance of global warming.

Defendants now move this Court for order dismissing both causes of action, arguing that Plaintiff is improperly attempting to create a new global warming tort that has no legitimate origins in federal or state law.  More specifically, Defendants move to dismiss Plaintiff's claims on four grounds: (1) the entire case raises nonjusticiable issues properly reserved for resolution by the political branches of government; (2) the complaint fails to state a valid nuisance claim under federal common law; (3) the complaint fails to state a valid nuisance claim under California law; and (4) the nuisance claim under California law is preempted by federal law.

## LEGAL STANDARD

### I.     Lack of Subject Matter Jurisdiction – Rule 12(b)(1)

Rule 12(b)(1) of the Federal Rules of Civil Procedure authorizes a party to move to dismiss a claim for lack of subject matter jurisdiction.  Federal courts are courts of limited jurisdiction; thus, the Court presumes lack of jurisdiction, and the party seeks to invoke the court's jurisdiction bears the burden of proving that subject matter jurisdiction exists.  *See Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994).  A party challenging the court's jurisdiction under Rule 12(b)(1) may do so by raising either a facial attack or a factual attack.  *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).

A facial attack is one where "the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction."  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  In evaluating a facial attack to jurisdiction, the Court must accept the factual allegations in plaintiff's complaint as true.  *See Miranda v. Reno*, 238 F.3d 1156, 1157 n. 1 (9th Cir. 2001).  For a factual attack, in contrast, the Court may consider extrinsic evidence.  *See Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir.1987).  Further, the court does not have to assume the truthfulness of the allegations, and may resolve any factual disputes.  *See White*, 227 F.3d at 1242.  Thus, "[o]nce the moving party has converted the motion to dismiss into a

factual motion by presenting affidavits or evidence properly before the court, the party opposing the
motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing
subject matter jurisdiction." *Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039 n.2 (9th Cir.
2003).

In the Ninth Circuit, "[j]urisdictional dismissals in cases premised on federal-question
jurisdiction are exceptional, and must satisfy the requirements specific in *Bell v. Hood*, 327 U.S. 678
(1946)." *Sun Valley Gas., Inc. v. Ernst Enters.*, 711 F.2d 138, 140 (9th Cir. 1983); *see Safe Air for
Everyone*, 373 F.3d at 1039.  The *Bell* standard provides that jurisdictional dismissals are warranted
"where the alleged claim under the [C]onstitution or federal statute clearly appears to be immaterial
and made solely for the purpose of obtaining federal jurisdiction or where such a claim is wholly
insubstantial and frivolous."  327 U.S. at 682-83.  Additionally, the Ninth Circuit has admonished
that a "[j]urisdictional finding of genuinely disputed facts is inappropriate when 'the jurisdictional
issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the
resolution of factual issues going to the merits' of an action." *Sun Valley*, 711 F.2d at 139.  The
jurisdictional issue and the substantive issues are intertwined where "a statute provides the basis for
both the subject matter jurisdiction of the federal court and the plaintiff's substantive claim for
relief." *Safe Air for Everyone*, 373 F.3d at 1039 (quoting *Sun Valley*, 711 F.2d at 139).

## II.       Motion to Dismiss – Rule 12(b)(6)

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal
sufficiency of a claim. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  Because the focus of a
Rule 12(b)(6) motion is on the legal sufficiency, rather than the substantive merits of a claim, the
Court ordinarily limits its review to the face of the complaint. *See Van Buskirk v. Cable News
Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002).  In considering a Rule 12(b)(6) motion, the Court
accepts the plaintiff's material allegations in the complaint as true and construes them in the light
most favorable to the plaintiff. *See Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000).
Generally, dismissal is proper only when the plaintiff has failed to assert a cognizable legal theory or
failed to allege sufficient facts under a cognizable legal theory. *See SmileCare Dental Group v.
Delta Dental Plan of Cal., Inc.*, 88 F.3d 780, 782 (9th Cir. 1996); *Balisteri v. Pacifica Police Dep't*,

United States District Court
For the Northern District of California

4

1    901 F.2d 696, 699 (9th Cir. 1988); *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th

2    Cir. 1984).  In pleading sufficient facts, however, a plaintiff must suggest his or her right to relief is

3    more than merely conceivable, but plausible on its face.  *See Bell Atlantic Corp. v. Twombly*, 127

4    S.Ct. 1955, 1974 (2007).

**ANALYSIS**

5

6    **I.    Chronology of Relevant Environmental Policy**

7         A chronology of the relevant environmental policy on global warming is helpful in setting

8    the stage for the issues now before the Court.  Congress and the Executive Branch have taken

9    several actions to understand and address the complex issue of global warming.  *Connecticut v.*

10   *American Elec. Power Co.*, 406 F. Supp. 2d 265, 269 (S.D.N.Y. 2005) ("*AEP*").

11        In 1978, Congress established a "national climate program" to improve understanding of

12   global climate change through research, data collection, assessments, information dissemination, and

13   international cooperation.  *See* National Climate Program Act of 1978, 15 U.S.C. §§ 2901, *et seq*.

14   Two years later, Congress directed the Office of Science and Technology Policy to engage the

15   National Academy of Sciences in a study of the "projected impact, on the level of carbon dioxide in

16   the atmosphere, of fossil fuel combustion, coal-conversion and related synthetic fuels activities"

17   authorized by the Energy Security Act.  *See* Energy Security Act, Pub. L. No. 96-294, tit. VII, § 711,

18   94 Stat. 611, 774-75 (1980).

19        Congress next addressed the issue in 1987, when it enacted the Global Climate Protection

20   Act, Title XI of Pub.L. 100-204, 101 Stat. 1407, note following 15 U.S.C. § 2901.  Finding that

21   "manmade pollution – the release of carbon dioxide, chlorofluorocarbons, methane, and other trace

22   gases into the atmosphere – may be producing a long-term and substantial increase in the average

23   temperature on Earth," § 1102(1), 101 Stat. 1408, Congress directed EPA to propose to Congress a

24   "coordinated national policy on global climate change," § 1103(b), and ordered the Secretary of

25   State to work "through the channels of multilateral diplomacy" and coordinate diplomatic efforts to

26   combat global warming, § 1103(c).  Congress emphasized that "ongoing pollution and deforestation

27   may be contributing now to an irreversible process" and that "[n]ecessary actions must be identified

28   and implemented in time to protect the climate." § 1102(4).

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1    Meanwhile, the scientific community's understanding of climate change and its causes

2    continued to progress.  In 1990, the Intergovernmental Panel on Climate Change ("IPCC"), a

3    multinational scientific body organized under the auspices of the United Nations, published its first

4    comprehensive report on the topic. Drawing on expert opinions from across the globe, the IPCC

5    concluded that "emissions resulting from human activities are substantially increasing the

6    atmospheric concentrations of . . . greenhouse gases [which] will enhance the greenhouse effect,

7    resulting on average in an additional warming of the Earth's surface."  IPCC, Climate Change: The

8    IPCC Scientific Assessment, p. xi (J. Houghton, G. Jenkins, & J. Ephraums eds. 1991).

9    Also in 1990, Congress enacted the Global Change Research Act.  15 U.S.C. §§ 2931-2938.

10    This Act established a ten-year research program for global climate issues.  § 2932.  One of the

11    Act's provisions directed the President to establish a research program to "improve understanding of

12    global change," § 2933, and provided for scientific assessments every four years that "analyze[ ]

13    current trends in global change," § 2936(3).  Congress also established a program to research

14    agricultural issues related to global climate change.  Pub. L. No. 101-624, tit. XXIV, § 2402, 104

15    Stat. 4058, 4058-59 (1990).  Two years later, the Secretary of Energy was directed to conduct

16    several assessments related to greenhouse gases and report to Congress.  *See* Energy Policy Act of

17    1992, Pub. L. No. 102-486, § 1604, 106 Stat. 2776, 3002.

18    In 1992, President George H. W. Bush signed, and the Senate ratified, the United Nations

19    Framework Convention on Climate Change ("UNFCCC").[2]  The UNFCCC was a nonbinding

20    agreement among 154 nations to reduce atmospheric concentrations of carbon dioxide and other

21    greenhouse gases for the purpose of "prevent[ing] dangerous anthropogenic [ i.e., human-induced]

22    interference with the [Earth's] climate system." S. Treaty Doc. No. 102-38, Art. 2, p. 5 (1992).  The

23    UNFCCC brought together a coalition of countries to work toward a coordinated approach to

24    address the international issue of global warming.  This ratification was the result of the negotiations

25    authorized by the Global Climate Protection Act of 1987.  Following ratification of the UNFCCC,

26

27    _____

28    [2]Responding to the IPCC report, the United Nations convened the "Earth Summit" in 1992 in Rio de Janeiro.  The industrialized countries listed in Annex I to the UNFCCC undertook to reduce their emissions of greenhouse gases to 1990 levels by the year 2000. No immediate restrictions were imposed on developing countries, including China and India.  They could choose to become Annex I countries when sufficiently developed.

United States District Court

For the Northern District of California

1    member nations negotiated the Kyoto Protocol, which called for mandatory reductions in the

2    greenhouse gas emissions of developed nations.  *See* UNFCCC, Kyoto Protocol (Dec. 11, 1997).

3            Although President William Jefferson Clinton signed the Kyoto Protocol ("Protocol"), it was

4    not presented to the Senate, which formally expressed misgivings over the prospect that the potential

5    economic burdens of carbon dioxide reductions would be shouldered exclusively by developed

6    nations.  *See, e.g.* United States. S. Res. 98, 105th Cong. (1997) (resolving by vote of 95-0 to urge

7    the President not to sign any agreement that would result in serious harm to the economy or that did

8    not include provisions regarding the emissions of developing nations).  Thereafter, Congress passed

9    a series of bills that barred the EPA from implementing the Protocol.  *See* Pub. L. No. 105-276, 112

10   Stat. 2461, 2496 (1998); Pub. L. No. 106-74, 113 Stat. 1047, 1080 (1999); Pub. L. No. 106-377, 114

11   Stat. 1141, 1441A-41 (2000).

12           Currently, President George W. Bush opposes the Protocol because it exempts developing

13   nations who are major emitters, fails to address two major pollutants, and would have a negative

14   economic impact on the United States.[3]  Instead, the Bush Administration's policy "emphasizes

15   international cooperation and promotes working with other nations to develop an efficient and

16   coordinated response to global climate change" that the EPA describes as a "prudent," "realistic and

17   effective long-term approach to the global climate change issue."  68 Fed. Reg. at 52933.

18           By way of this lawsuit, Plaintiff asserts claims for nuisance and seeks damages for loss or

19   harm resulting from Defendants' manufacture of automobiles that emit carbon dioxide.  Against this

20   backdrop, the Court now turns to examine the question of whether Plaintiff's claims present non-

21   justiciable political questions.

22   **II.        Political Question – Justiciability**

23           The threshold issue in this case is whether the complaint raises non-justiciable political

24   questions that are beyond the limits of this Court's jurisdiction.  Defendants argue that Plaintiff's

25   nuisance claims present nonjusticiable political questions.  According to Defendants, global

26

27           [3] *See* Transcript, President Bush Discusses Global Climate Change (Jun. 11, 2001); *see also* Letter from President
     George W. Bush to Senators Hagel, Helms, Craig, & Roberts (March 13, 2001) *available at*
28    http:www.whitehouse.gov/news/releases/2001/03/20010314.html (stating the administration "oppose[s] the Kyoto Protocol
     because it exempts 80 percent of the world, including major population centers such as China and India, from compliance.").

**United States District Court**
For the Northern District of California

1    warming and its causes are issues of public and foreign policy fraught with scientific complexity, as

2    well as political, social, and economic consequences.  Defendants contend that the political branches

3    of the federal government, and not the courts, must address and resolve these issues.  Plaintiff

4    maintains that its federal common law nuisance claim, although complex, is the type of case that

5    courts routinely resolve.  Plaintiff does not directly address the justiciability of its state law nuisance

6    claim in its papers.

7    Because these claims touch on public policy, foreign policy, and political issues, it is

8    "tempting to jump to the conclusion that such claims are barred by the political question doctrine."

9    *Alperin v. Vatican Bank*, 410 F.3d 532, 537 (9th Cir. 2005).  However, "it is error to suppose that

10   every case or controversy which touches foreign relations lies beyond judicial cognizance."  *Baker v.*

11   *Carr*, 369 U.S. 186, 211 (1962).  The justiciability inquiry is limited to "'political questions,' not . . .

12   'political cases,'" *id*. at 217, and should be made on a "case-by-case" basis, *id*. at 211.

13   To determine if a case is justiciable in light of the separation of powers ordained by the

14   Constitution, a court must decide "whether the duty asserted can be judicially identified and its

15   breach judicially determined, and whether protection for the right asserted can be judicially

16   molded."  *Id*. at 198.  Six "formulations" indicate the existence of a non-justiciable political

17   question: (1) a textually demonstrable constitutional commitment of the issue to a coordinate

18   political department; (2) a lack of judicially discoverable and manageable standards for resolving it;

19   (3) the impossibility of deciding without an initial policy determination of a kind clearly for

20   nonjudicial discretion; (4) the impossibility of a court's undertaking independent resolution without

21   expressing lack of the respect due coordinate branches of the government; (5) an unusual need for

22   unquestioning adherence to a political decision already made; or (6) the potentiality of

23   embarrassment from multifarious pronouncements by various departments on one question.  *Vieth v.*

24   *Jubelirer*, 541 U.S. 267, 277-78 (2004) (quoting *Baker*, 369 U.S. at 217).  Dismissal on the basis of

25   the political question doctrine is appropriate only if one of these formulations[4] is "inextricable" from

26   the case.  *Baker*, 369 U.S. at 217.  However, these tests are more discrete in theory than in practice,

27   _____

28   [4]Although termed as "formulations" in *Baker*, the plurality in *Vieth v. Jubelirer*, 541 U.S. 267 (2004), recently
     described these criteria as "six independent tests."  *Alperin*, 410 F.3d at 544.

with the analyses often collapsing into one another. *See Nixon v. United States*, 506 U.S. 224, 228-29 (1993) (describing interplay between the first and second *Baker* tests). This overlap is not surprising given the common underlying inquiry of whether the very nature of the question is one that can properly be decided by the judiciary. *Alperin*, 410 F.3d at 544. Although several of the *Baker* indicators support the Court's conclusion that Plaintiff's current claims raise non-justiciable political questions, the third indicator is most relevant on the current record. *See Connecticut v. American Electric Company, Inc. (AEP)*, 406 F. Supp. 2d 265, 272 (S.D.N.Y. 2005) (stating that third *Baker* factor is most relevant)..

### A.   Indicia of Non-Justiciability

#### 1.   Resolution Of Plaintiff's Federal Common Law Nuisance Claim Would Require This Court To Make An Initial Policy Decision

The third *Baker* indicator asks whether the Court can decide the case "without [making] an initial policy determination of a kind clearly for nonjudicial discretion." *Baker*, 369 U.S. at 217. This factor largely controls the analysis in the current case due to the complexity of the initial global warming policy determinations that must be made by the elected branches prior to the proper adjudication of Plaintiff's federal common law nuisance claim. *AEP*, 406 F. Supp. 2d at 273. Defendants argue that it is impossible for this Court to decide this case without making an initial policy decision of the kind reserved for the political branches of government. Relying on the chronology of legislative and executive efforts in the field of global warming, Defendants argue that any meaningful reduction in carbon dioxide emissions can be achieved only if a broad array of domestic and international activities are regulated in coordination. According to Defendants, this is a policy determination of the highest order more properly reserved for the political branches of government. In opposition, Plaintiff proffers that resolution of this case does not require the Court to make an initial policy determination, but instead requires the Court to do nothing more than apply facts to well-established law. Plaintiff contends that Defendants are contributing to an interstate nuisance that is causing concrete damage to the State of California, which is properly compensable in damages. Plaintiff asserts that it should not have to await a comprehensive political solution to global warming.

United States District Court

For the Northern District of California

As the Supreme Court has recognized, to resolve typical air pollution cases, courts must strike a balance "between interests seeking strict schemes to reduce pollution rapidly to eliminate its social costs and interests advancing the economic concern that strict schemes [will] retard industrial development with attendant social costs." *AEP*, 406 F. Supp. 2d at 272 (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc*., 467 U.S. 837, 847 (1984)). Balancing those interests, together with the other interests involved, is impossible without an "initial policy determination" first having been made by the elected branches to which our system commits such policy decisions, namely, Congress and the President. *Id*. Courts have recognized the complexity of the "initial policy determinations" that must be made by the elected branches before a non-elected court can properly adjudicate a global warming nuisance claim. *Id*. at 273.

In *AEP*, the court rejected a similar global warming nuisance claim finding that resolution of the issues required "an initial policy determination of a kind clearly for non-judicial discretion." *AEP*, 406 F. Supp. 2d at 274. There, the Attorneys General of California and other States brought a global warming public nuisance claim against certain electric utilities seeking abatement. *Id*. at 267, 270. In particular, the plaintiffs sought an order: (1) holding each of the defendants jointly and severally liable for contributing to an ongoing public nuisance, global warming; and (2) enjoining each of the defendants to abate its contribution to the nuisance be capping its emission of carbon dioxide and then reducing those emissions by a specified percentage each year for at least a decade. *Id*. at 270. After outlining the historical legislative and executive efforts to address global warming, the court stated, "[t]he explicit statements of Congress and the Executive on the issue of global climate change in general and their specific refusal to impose the limits on carbon dioxide emissions Plaintiffs now seek to impose by judicial fiat confirm that making the 'initial policy determination[s]' addressing global climate change is an undertaking for the political branches." *Id*. at 274.

Also in *AEP*, the court noted that the EPA's commentary on global warming was compelling support for the notion that the elected branches must make an initial policy determination on global warming before the courts can properly adjudicate such a claim. *See id*. at 273. The EPA, the agency in which "Congress has vested administrative authority" over the "technically complex area

10

1   of environmental law," has been grappling with the proper approach to the issue of global climate

2   change for a number of years.  *Id*. (citation omitted).  As the EPA has stated:

3

4              It is hard to imagine any issue in the environmental area having greater
               "economic and political significance" than regulation of activities that
               might lead to global climate change. 68 Fed. Reg. at 52928.  The issue

5              of global climate change . . . has been discussed extensively during the
               [past] Presidential campaigns; it is the subject of debate and

6              negotiation in several international bodies; and numerous bills have
               been introduced in Congress over the last 15 years to address the

7              issue." 68 Fed. Reg. at 52928.  Unilateral [regulation of carbon
               dioxide emissions in the United States] could also weaken U.S. efforts

8              to persuade key developing countries to reduce the [greenhouse gas]
               intensity of their economies. 68 Fed. Reg. at 52931.  Unavoidably,

9              climate change raises important foreign policy issues, and it is the
               President's prerogative to address them. 68 Fed. Reg. at 52931.

10             Virtually every sector of the U.S. economy is either directly or
               indirectly a source of [greenhouse gas] emissions, and the countries of

11             the world are involved in scientific, technical, and political-level
               discussions about climate change. 68 Fed. Reg. at 52928.

12

13  *Id*.

14         This Court is mindful that the federal common law nuisance claim in *AEP* sought only

15  equitable relief, whereas Plaintiff's current federal common law nuisance claim seeks damages.

16  However, despite this difference, the Court finds that the same justiciability concerns predominate

17  and significantly constrain this Court's ability to properly adjudicate the current claim.  Regardless

18  of the type of relief sought, the Court must still make an initial policy decision in deciding whether

19  there has been an "unreasonable interference with a right common to the general public."  *In re*

20  *Oswego Barge Corp.*, 664 F.2d 327, 332 n.5 (2d Cir. 1981) (describing public nuisance).  Plaintiff

21  insists that in order to adjudicate its claim, "[t]he Court will not be required to determine whether

22  [D]efendants' actions have been unreasonable, but [instead] whether the interference suffered by

23  California is unreasonable."  (Pl's. Opp. at 21:4-5.)  This distinction is unconvincing because

24  regardless of the relief sought, the Court is left to make an initial decision as to what is unreasonable

25  in the context of carbon dioxide emissions.  Such an exercise would require the Court to create a

26  quotient or standard in order to quantify any potential damages that flow from Defendants' alleged

27  act of contributing thirty percent of California's carbon dioxide emissions.  Just as in *AEP*, the

28  adjudication of Plaintiff's claim would require the Court to balance the competing interests of

**United States District Court**
For the Northern District of California

11

United States District Court

For the Northern District of California

1  reducing global warming emissions and the interests of advancing and preserving economic and

2  industrial development.  *AEP*, 406 F. Supp. 2d at 272.  The balancing of those competing interests is

3  the type of initial policy determination to be made by the political branches, and not this Court.

4          The political branches' actions and deliberate inactions in the area of global warming further

5  highlight this case as one for nonjudicial discretion.  An examination of the political branches'

6  consideration of the issues surrounding global climate change counsels against an initial policy

7  determination to be made by the courts.  As early as 1978, and as recent as the current

8  administration, the elected branches of government have addressed the issues of climate change and

9  global warming.  As the above-referenced chronological policy summary demonstrates, reductions

10  in carbon dioxide emissions is an issue still under active consideration by those branches of

11  government.

12          Turning to the current legislative landscape, it is evident that Congress established a

13  comprehensive state and federal scheme to control air pollution in the United States in the Clean Air

14  Act, 42 U.S.C. § 7401 *et seq.* ("CAA").  *National Audubon Society v. Dept. of Water*, 869 F.2d

15  1196, 1201 (9th Cir. 1988).  The central elements of this comprehensive scheme are the Act's

16  provisions for uniform national standards of performance for new stationary sources of air pollution.

17  42 U.S.C. § 7411.  The Act's provisions provide for uniform national emission standards for

18  hazardous air pollutants likely to cause an increase in mortality or serious illness, § 7412, for

19  promulgation of primary and secondary national ambient air quality standards (NAAQS), §§

20  7408-09, and for the development of national ambient air quality standards for motor vehicle

21  emissions.  § 7521; *National Audubon Society*, 869 F.2d at 1202.[5]

22          Once the EPA determines that a particular pollutant has an adverse effect on public health or

23  welfare and originates from one or more numerous or diverse mobile or stationary sources, the EPA

24  _____

25          [5]Two sections of the CAA govern the establishment and revision of the national ambient air quality standards.
    Section 108 directs the Administrator of the EPA to identify pollutants which may reasonably be anticipated to endanger
    public health or welfare and to issue air quality criteria for them.  42 U.S.C. § 7408.  Section 109 directs the Administrators

26  to propose and promulgate "primary" and "secondary" NAAQS for pollutants identified under Section 108.  42 U.S.C. §
    7409.  The Act defines a primary standard as one the attainment and maintenance of which, in the judgment of the

27  Administrator, based on specific criteria and allowing for an adequate margin of safety, is requisite to protect the public
    health. 42 U.S.C. §7409.  A secondary standard must specify a level of air quality, the attainment of which, in the judgment

28  of the Administrator, based on specific criteria and allowing for an adequate margin of safety, is requisite to protect the public
    welfare from any known or anticipated adverse effects associated with the presence of the pollutant in the ambient air.  *Id.*

United States District Court

For the Northern District of California

1    must develop national air quality standards and the states must implement them within a limited time

2    period.  *National Audubon Society*, 869 F.2d at 1202 (citing *Natural Resources Defense Council,*

3    *Inc. v. Train*, 545 F.2d 320, 322-24 (2d Cir. 1976)).  The CAA provides that "[e]ach state shall have

4    the primary responsibility for assuring air quality within the entire geographic area comprising such

5    state," 42 U.S.C. § 7407(a), and "[t]hat the prevention and control of air pollution at its source is the

6    primary responsibility of states and local governments." 42 U.S.C. § 7401(a)(3).  However, section

7    209(a) of the CAA expressly precludes state regulation of emissions from new automobiles, with

8    certain exceptions.  42 U.S.C. § 7543.

9        Next, turning to the Energy Policy and Conservation Act, 49 U.S.C. § 32901 *et seq*.

10   ("EPCA"), Congress established a comprehensive response to the energy crisis of the 1970s.  Pub.

11   L. No. 94-163, 89 Stats 871 (1975).  The EPCA imposes fleet-wide fuel economy requirements on

12   the automobile industry in the form of mandatory corporate average fuel economy ("CAFE")

13   standards.  Under CAFE standards, an automobile manufacturer may sell any combination of its

14   vehicles consumers choose to buy, as long as the average fuel economy levels of its nationwide

15   vehicle fleet does not exceed the applicable CAFE standard.  49 U.S.C. § 32902.  At the conclusion

16   of each model year, EPA calculates the fuel economy of each model and the number of vehicles

17   manufactured in each model line within a manufacturer's fleet.  42 U.S.C. § 32904.  A manufacturer

18   may be liable for civil penalties if it fails to meet the CAFE standard for a model year.  42 U.S.C. §

19   32912.  The EPCA provides for a congressionally-established average fuel economy standard for

20   passenger automobiles of 27.5 miles per gallon, and expressly preempts any state law relating to fuel

21   economy standards.  49 U.S.C. §§ 32902(b), 32919.  The EPCA also provides that "the Secretary of

22   Transportation may prescribe regulations amending the standard . . . for a model year to a level the

23   Secretary decides is the maximum feasible average fuel economy level for that model year."  49

24   U.S.C. § 32902(c).

25       In determining the "maximum feasible average fuel economy level," the Department of

26   Transportation ("DOT") – which has delegated this responsibility to the National Highway Traffic

27   Safety Administration ("NHTSA") – is required to consider and balance a number of specified

28   statutory factors raising competing public policy concerns.  These factors include technological

United States District Court

For the Northern District of California

1    feasibility, economic practicability, the effect of other motor vehicle standards of the Government on

2    fuel economy, and the need of the United States to conserve energy.  49 U.S.C. § 32902(f).  After

3    considering and balancing the statutory factors, NHTSA determines the "maximum feasible" level of

4    fuel economy that can be imposed through regulation without suffering the attendant consequences

5    Congress sought to avoid.  49 U.S.C. § 32902(f).

6           By themselves, the CAA and EPCA do not directly address the issue of global warming and

7    carbon dioxide emission standards.  However, when read in conjunction with the prevalence of

8    international and national debate, and the resulting policy actions and inactions, the Court finds that

9    injecting itself into the global warming thicket at this juncture would require an initial policy

10   determination of the type reserved for the political branches of government.  A judicial

11   determination of monetary damages for Plaintiff's global warming nuisance tort would improperly

12   place this Court into precisely the geopolitical debate more properly assigned to the coordinate

13   branches and would potentially undermine the political branches' strategic choices by "weaken[ing]

14   U.S. efforts to persuade key developing countries to reduce the [greenhouse gas] intensity of their

15   economies."  68 Fed. Reg. at 52927, 52931.  Plaintiff has failed to provide the Court with sufficient

16   explanation or legal support as to how this Court could impose damages against the Defendant

17   automakers without unreasonably encroaching into the global warming issues currently under

18   consideration by the political branches.  Because a comprehensive global warming solution must be

19   achieved by a broad array of domestic and international measures that are yet undefined, it would be

20   premature and inappropriate for this Court to wade into this type of policy-making determination

21   before the elected branches have done so.

22          A recent Supreme Court opinion further underscores the conclusion that policy decisions

23   concerning the authority and standards for carbon dioxide emissions lie with the political branches

24   of government, and not with the courts.  *See Massachusetts v. Environmental Protection Agency*,

25   127 S. Ct. 1438 (2007).  In *Massachusetts*, a group of private environmental organizations filed a

26   rulemaking petition requesting the EPA to regulate carbon dioxide emissions from new motor

27   vehicles.  *Id*. at 1446.  The EPA denied the petition, explaining: (1) that it lacked authority under the

28

CAA to regulate such emissions[6]; and (2) that even if it possessed the necessary statutory authority it would decline to exercise it. *Id*. at 1450. A group of States, local governments, and private organizations thereafter sought judicial review of the EPA's denial. *Id*. The D.C. Circuit rejected the plaintiffs' challenge, finding that the EPA had properly denied the rulemaking petition. *Id*. at 1451-52. In reversing the circuit court's decision, the Supreme Court held: (1) that the plaintiffs had standing under Article III to challenge the EPA's denial of rulemaking petition, *id*. at 1452-58; (2) that the EPA possesses authority under the CAA to regulate new motor vehicle carbon dioxide emissions, *id*. at 1459-62; and (3) that the EPA failed to provide a "reasoned explanation" for its conclusion that it would not regulate such emissions even if it possessed the authority to do so. The Supreme Court's holdings with respect to standing and the reach of the EPA's regulatory authority are particularly relevant to this Court's finding that Plaintiff's claims are non-justiciable.

First, in finding that the plaintiffs had standing, the Supreme Court relied upon the notion that certain constitutional principles of sovereignty afford the States "special solitude" to seek judicial review of decisions by federal regulatory agencies because the States have "surrendered" to the federal government their right to engage in certain forms of regulations. *Id*. at 1454-55. To that end, the Supreme Court stated,

> When a State enters the Union, it surrenders certain sovereign prerogatives. Massachusetts cannot invade Rhode Island to force reductions in greenhouse gas emissions, it cannot negotiate an emissions treaty with China or India, and in some circumstances the exercise of its police powers to reduce in-state motor-vehicle emissions might well be pre-empted. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982) ("One helpful indication in determining whether an alleged injury to the health and welfare of its citizens suffices to give the State standing to sue *parens patriae* is whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers").
>
> *These sovereign prerogatives are now lodged in the Federal Government*, and Congress has ordered EPA to protect Massachusetts (among others) by prescribing standards applicable to the "emission of any air pollutant from any class or classes of new motor vehicle engines, which in [the Administrator's] judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7521(a)(1). Congress has moreover recognized a concomitant procedural right to challenge the rejection of its

---

[6]The EPA had previously ruled that the Clean Air Act does not authorize carbon dioxide regulation. *Control of Emissions from New Highway Vehicles and Engines*, 68 Fed. Reg. 52922-02 (Sept. 8, 2003); 68 Fed. Reg. at 52928.

United States District Court
For the Northern District of California

1    rulemaking petition as arbitrary and capricious. § 7607(b)(1). Given that
     procedural right and Massachusetts' stake in protecting its
2    quasi-sovereign interests, the Commonwealth is entitled to special
     solicitude in our standing analysis.
3

4    *Id*. (emphasis added).  Underpinning the Supreme Court's standing analysis is the concept that the

5    authority to regulate carbon dioxide lies with the federal government, and more specifically with the

6    EPA as set forth in the CAA.  Also inherent in the Supreme Court's reasoning is the principle that

7    any State that is dissatisfied with the federal government's global warming policy determinations

8    may exercise its "procedural right" to advance its interests through administrative channels and, if

9    necessary, to "challenge the rejection of its rulemaking petition as arbitrary and capricious."  42

10   U.S.C. § 7607.  Thus, such an approach emphasizes that initial policy determinations are made by

11   the political branches while preserving a framework for judicial review of those determinations.

12          Second, in holding that the EPA possessed authority under the CAA to regulate new motor

13   vehicle carbon dioxide emissions, the Supreme Court emphasized that Section 202(a)(1) of the CAA

14   provides that the EPA "'shall by regulation prescribe . . . standards applicable to the emission of any

15   air pollutant from any class or classes of new motor vehicles or new motor vehicle engines, which in

16   [the Administrator's] judgment cause, or contribute to, air pollution which may reasonably be

17   anticipated to endanger public health or welfare.'" *Massachusetts*, 127 S. Ct. at 1459-60 (quoting 42

18   U.S.C. § 7521(a)(1)).  Relying on the CAA's broad sweeping definition of "air pollutant" as "any air

19   pollution agent or combination of such agents, including any physical, chemical . . . substance or

20   matter which is emitted into or otherwise enters the ambient air . . .", the Supreme Court found that

21   such definition embraced "all airborne compounds of whatever stripe, and underscores that intent

22   through the repeated use of the word 'any.'"  *Id*. at 1460 (citing 42 U.S.C. § 7602(g).)

23          The underpinnings of the Supreme Court's rationale in *Massachusetts* only reinforce this

24   Court's conclusion that Plaintiff's current tort claim would require this Court to make the precise

25   initial carbon dioxide policy determinations that should be made by the political branches, and to the

26   extent that such determination falls under the CAA, by the EPA.  Because the States have

27   "surrendered" to the federal government their right to engage in certain forms of regulations and

28   therefore may have standing in certain circumstances to challenge those regulations, and because

new automobile carbon dioxide emissions are such a regulation expressly left to the federal government, a resolution of this case would thrust this Court beyond the bounds of justiciability. Plaintiff has failed to offer an adequate explanation of how this Court would possibly endeavor to make the initial policy determinations that would be both necessary and antecedent to a resolution of this case.

Plaintiff attempts to accord a different significance to the *Massachusetts* decision. Plaintiff accuses Defendants of putting a "positive spin on a case they lost," (Pl.'s Supp. Br. at 1:2-3), and argues that the claims at issue in *Massachusetts* did not implicate the pending questions of justiciability now before this Court. According to Plaintiff, *Massachusetts* allows a State – like California – to pursue its claim in federal court for injuries related to a global warming interstate tort. Finally, Plaintiff argues that for the same reasons the EPA may not refuse to regulate carbon dioxide, this Court may not refuse to address the issue. The Court finds Plaintiff's arguments unconvincing.

While the Supreme Court did not expressly address the issue of justiciability, it certainly did not sanction the justiciability of the interstate global warming damages tort claim now before this Court. Rather, the Supreme Court's analysis on the issue of standing counsels with convincing force to the contrary. As noted above, a State has standing to pursue its "procedural right" through administrative channels, and if necessary, to "challenge the rejection of its rulemaking petition as arbitrary and capricious" as did the plaintiffs in *Massachusetts*.[7] 42 U.S.C. § 7607(b)(1). Unlike the procedural posture of *Massachusetts*, the current case is not before the Court by way an administrative challenge to an EPA's decision, but rather as an interstate global warming damages tort claim. Plaintiff's argument essentially ignores this procedural distinction. Similarly, the Court finds Plaintiff's attempt to equate this Court's decision on justiciability with the EPA's decision on whether to regulate carbon dioxide emissions to be problematic. The EPA's global warming carbon dioxide policymaking determinations are statutorily governed by the CAA, and are therefore not analogous the justiciability principles which govern the issues now before the Court. Accordingly,

---

[7]As discussed more fully below, California may seek a waiver from the EPA under section 209(b) of the CAA, *see* 42 U.S.C. § 7543(b), for permission to promulgate and enforce its own emissions standards and regulations.

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1  this Court is not persuaded to adopt Plaintiff's reading of *Massachusetts*.

2      For these reasons, the Court find that it cannot adjudicate Plaintiff's federal common law

3  global warming nuisance tort claim without making an initial policy determination of a kind clearly

4  for nonjudicial discretion.

5            **2.**    **Plaintiff's Claim Implicates A Textually Demonstrable Constitutional Commitment To The Political Branches**

6

7      Several other factors outlined by the Supreme Court in *Baker* weigh in favor of the Court's

8  finding that Plaintiff's claim presents a non-justiciable political question.  The first *Baker* test

9  requires a court to determine whether the issues before the court implicate a textually demonstrable

10  constitutional commitment to the political branches of government.  *Baker*, 369 U.S. at 217.  In

11  support of their argument that the Constitution reserves the issues in this case for the political

12  branches of government, Defendants rely on Congress's enumerated power over interstate

13  commerce and the political branches' enumerated power over foreign policy.  *See* U.S. Const. art. I,

14  § 8, cl. 3; art. II, § 2, cl. 2.  Plaintiff disagrees and maintains its environmental nuisance claim is

15  committed to the federal judiciary and has no import on interstate commerce or foreign policy.

16      "In order to determine whether there has been a textual commitment to a coordinate

17  department of the Government, [a court] must interpret the Constitution."  *Powell v. McCormack*,

18  395 U.S. 486, 519 (1969).  The test for a "textual commitment to a coordinate political department"

19  is not completely separate from the test for "a lack of judicially discoverable and manageable

20  standards" for resolving it.  *Nixon*, 506 U.S. at 228.  The lack of judicially manageable standards

21  may strengthen the conclusion that there is a textually demonstrable commitment to a coordinate

22  branch.  *Id*. at 228-29.  At issue here are the textual commitment of *interstate commerce* and *foreign*

23  *policy* to the political branches of government.

24      As to issues of commerce, the Commerce Clause, Article I, Section 8, Clause 3 of the United

25  States Constitution, empowers the United States Congress "[t]o regulate Commerce with foreign

26  Nations, and among the several States, and with the Indian Tribes."  U.S. Const. art. I, § 8, cl. 3.  A

27  State's power to impose burdens on the interstate market for automobiles is not only subordinate to

28  the federal power over interstate commerce, *Gibbons v. Ogden*, 9 Wheat. 1, 194-96 (1824), but is

also constrained by the need to respect the interests of other States. *See*, *e.g*., *Healy v. Beer Institute*, 491 U.S. 324, 335-36 (1989) (the Constitution has a "special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres") (footnote omitted); *Edgar v. MITE Corp.*, 457 U.S. 624, 643 (1982); *BMW of N. Am. v. Gore*, 517 U.S. 559, 571-72 (1996).

As to issues of foreign policy, the power to regulate foreign affairs is vested exclusively in the political branches of government. *See e.g.*, *Deutsche v. Turner Corp.*, 324 F.3d 692, 709 (9th Cir. 2003). "It is axiomatic that 'the conduct of foreign relations is committed by the Constitution to the political departments of the Federal Government; [and] that the propriety of the exercise of that power is not open to judicial review.'" *Mingtai Fire & Marine Ins. Co. v. United Parcel Service*, 177 F.3d 1142, 1144-45 (9th Cir. 1999) (citations omitted). "The conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative – 'the political' – Departments of Government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision." *Baker*, 369 U.S. at 211 n.31. As the Ninth Circuit has stated, "we are mindful of the Supreme Court's admonition that it is up to the political branches to come to terms with these 'delicate [and] complex' foreign policy decisions 'for which the Judiciary has neither aptitude, facilities nor responsibility' . . . ." *Alperin*, 410 F.3d at 560.

In this case, by seeking to impose damages for the Defendant automakers' lawful worldwide sale of automobiles, Plaintiff's nuisance claims sufficiently implicate the political branches' powers over interstate commerce and foreign policy, thereby raising compelling concerns that warn against the exercise of subject matter jurisdiction on this record.

In addressing Congress's power over national and foreign commerce, the Court notes that recognizing such a new and unprecedented federal common law nuisance claim for damages would likely have commerce implications in other States by potentially exposing automakers, utility companies, and other industries to damages flowing from a new judicially-created tort for doing nothing more than lawfully engaging in their respective spheres of commerce within those States. *See Gore*, 517 U.S. at 571-72 (discussing Commerce Clause in tort context and declaring that "a State may not impose economic sanctions on violators of its laws with the intent of changing the

United States District Court

For the Northern District of California

1    tortfeasors' lawful conduct in other States.").  The Court finds that the concerns raised by the

2    potential ramifications of a judicial decision on global warming in this case would sufficiently

3    encroach upon interstate commerce, to cause the Court to pause before delving into such areas so

4    constitutionally committed to Congress.

5           In the area of foreign policy, the Court finds that the political branches have weighed in on

6    the issue, and have made foreign policy determinations regarding the United States' role in the

7    international concern about global warming.  The political branches have deliberately elected to

8    refrain from any unilateral commitment to reducing such emissions domestically unless developing

9    nations make a reciprocal commitment.  The EPA has recognized that imposing mandatory

10   unilateral restrictions on domestic manufacturers would impede that diplomatic objective.  68 Fed.

11   Reg. at 52931.  Furthermore, the fact that an award of damages would punish Defendants for

12   lawfully selling their automobiles both within California, and outside of California in the global

13   market, buttresses Defendants' position that a judicial determination of damages for carbon dioxide

14   emissions would run headlong into nonjusticiable foreign policy issues.

15          For these reasons, the Court finds that Plaintiff's federal common law global warming

16   nuisance tort would have an inextricable effect on interstate commerce and foreign policy – issues

17   constitutionally committed to the political branches of government.

18          **3.      There Is A Lack of Judicially Discoverable Or Manageable Standards By
                      Which To Resolve Plaintiff's Claim**

19

20          The second *Baker* indicator requires a court to determine whether there are judicially

21   discoverable or manageable standards available to resolve the question before it.  *Baker*, 369 U.S. at

22   217.  Defendants accord special significance to this indicator of justiciability.  Defendants assert that

23   it will be impossible for the Court to determine what constitutes an unreasonable level of carbon

24   dioxide produced by Defendants' vehicles, without making an initial policy determination of

25   national scope.  Defendants also point to the difficulty associated in evaluating the essential

26   elements of causation and injury, given the myriad sources of global greenhouse gas emissions and

27   the "[s]ubstantial scientific uncertainties [that] limit [the] ability to . . . separate out those changes

28   resulting from natural variability from those that are directly the result of increases in anthropogenic

[greenhouse gases]." 68 Fed. Reg. at 52930. Plaintiff avers that because this action seeks damages only, the legal framework for adjudicating this case is already established.

The crux of this inquiry is not whether the case is unmanageable in the sense of being large, complicated, or otherwise difficult to tackle from a logistical standpoint. *Alperin*, 410 F.3d at 552. Rather, courts must ask whether they have the legal tools to reach a ruling that is "principled, rational, and based upon reasoned distinctions." *Vieth*, 541 U.S. at 278.

In support of its argument that the legal framework is well-established, Plaintiff cites a number of trans-boundary nuisance cases. *See, e.g.*, *Illinois v. City of Milwaukee*, 406 U.S. 91 (1972) ("*Milwaukee I*") (seeking abatement of discharge of raw sewage into Lake Michigan), *vacated on other grounds*, *Milwaukee v. Illinois and Michigan*, 451 U.S. 304 (1981) ("*Milwaukee II*"); *New Jersey v. City of New York*, 283 U.S. 473 (1931) (originally seeking injunctive relief against diversion of waters from rivers); *New York v. New Jersey*, 256 U.S. 296 (1921) (seeking injunction against discharge of sewage into New York Bay); *North Dakota v. Minnesota*, 263 U.S. 365 (1923) (seeking injunction for actions causing flooding); *Georgia v. Tennessee Copper*, 206 U.S. 230 (1907) (seeking injunction from discharge of noxious gasses); *Missouri v. Illinois*, 200 U.S. 496 (1906) (seeking injunction to restrain the discharge of the sewage of Chicago through an artificial drainage canal into the Mississippi river); *Missouri v. Illinois*, 180 U.S. 208 (1901) (seeking injunction to restrain discharge of raw sewage into the Mississippi river); *Wisconsin v. City of Duluth*, 96 U.S. 379 (1877) (seeking injunction to restrain the diversion of the St. Louis river); *Pennsylvania v. The Wheeling & Belmont Bridge Co.*, 54 U.S. 518 (1851) (seeking injunction to restrain interference with Ohio river navigation); *Mayor, etc. of City of Georgetown v. Alexandria Canal Co.*, 37 U.S. 91 (1838) (seeking injunction to restrain river siltation). However, a review of these decisions reveals that the cases are legally, and factually, distinguishable in important respects.

Legally, these cases are distinguishable because the remedies sought therein were equitable remedies to enjoin or abate the nuisance, rather than the legal remedy of monetary damages sought in the current case. Additionally, the cases cited by Plaintiff do not provide the Court with legal framework or applicable standards upon which to allocate fault or damages, if any, in this case. The

21

United States District Court

For the Northern District of California

1    Court is left without guidance in determining what is an unreasonable contribution to the sum of

2    carbon dioxide in the Earth's atmosphere, or in determining who should bear the costs associated

3    with the global climate change that admittedly result from multiple sources around the globe.

4    Plaintiff has failed to provide convincing legal authority to support its proposition that the legal

5    framework for assessing global warming nuisance damages is well-established.

6           Factually, Plaintiff's cases are distinguishable because none of the pollution-as-public-

7    nuisance cases implicates a comparable number of national and international policy issues.  *See*

8    *AEP*, 406 F. Supp. 2d at 272 (noting that the plaintiffs' reliance on the same decisions was

9    unavailing due to the wide array of policy considerations not suitable for judicial determination).  To

10   the contrary, Plaintiff's cited decisions involve primarily issues of local concern involving a state or

11   public entity seeking equitable relief from a source-certain nuisance originating in a neighboring

12   state.  Plaintiff's cited decisions are also factually distinguishable because the cases involved trans-

13   boundary nuisances from identifiable external sources.  As more fully discussed below, this is a

14   critical distinction because the limited application of federal common law nuisance claims has been

15   recognized as a means for a State to seek abatement of pollution originating within the borders of

16   another state.  In this case, Plaintiff's global warning nuisance tort claim seeks to impose damages

17   on a much larger and unprecedented scale by grounding the claim in pollution originating both

18   within, and well beyond, the borders of the State of California.  Unlike the equitable standards

19   available in Plaintiff's cited cases, here the Court is left without a manageable method of discerning

20   the entities that are creating and contributing to the alleged nuisance.  In this case, there are multiple

21   worldwide sources of atmospheric warming across myriad industries and multiple countries.

22          "Were judges to resolve political questions, there would be no check on their resolutions

23   because the Judiciary is not accountable to any other branch or to the People.  Thus, when cases

24   present political questions, 'judicial review would be inconsistent with the Framers' insistence that

25   our system be one of checks and balances.'" *AEP*, 406 F. Supp 2d at 267.  For these reasons, the

26   Court finds that this *Baker* indicator is inextricable from the current case and that there is a lack of

27   judicially discoverable or manageable standards by which to properly adjudicate Plaintiff's federal

28   common law global warning nuisance claim.

United States District Court

For the Northern District of California

1    Because each of the identified *Baker* indicators is inextricable from Plaintiff's federal common

2    law global warning nuisance claim, the Court finds that the claim presents a non-justiciable political

3    question, and therefore **GRANTS** Defendants' motion to dismiss this claim.

4    **III.    Federal Common Law Claim for Nuisance**

5            Defendants alternatively argue that even if the case were justiciable, it must be dismissed for

6    lack of subject matter jurisdiction because there exists no "federal common law" nuisance claim for

7    global warming.  Defendants also state that fundamental separation-of-powers principles preclude

8    the judiciary from recognizing such a claim that would interfere with and undermine the policy

9    judgments of the political branches on matters of global warming.  More specifically, Defendants

10   argue that the statutory landscape effectively displaces any common law global warming nuisance

11   claim that might have existed.  Plaintiff counters that sufficient federal precedent exists recognizing

12   federal common law claims for public nuisance.  Plaintiff further maintains that there exists no

13   congressional action to displace their federal common law claim.  Plaintiff insists that the available

14   statutory backdrop is void of a comprehensive scheme that speaks directly to their claims in this

15   case.

16           Accordingly, the next issue before the Court is whether there exists a federal common

17   law claim for nuisance that would authorize Plaintiff's action for damages against the Defendant

18   automakers for creating and contributing to global warming.  If the Court were to find that such a

19   common law claim exists, the next step in the inquiry would be to determine whether the available

20   statutory guidelines speak sufficiently to the issue so as to displace the common law claim.

21   However, because the Court has already determined that the complaint raises non-justiciable

22   political questions, it need not and does not reach the issue of whether the federal common law

23   recognizes Plaintiff's global warming nuisance claim or whether congressional action has otherwise

24   displaced Plaintiff's claim.

25   **IV.    California State Law Claim for Nuisance**

26          The parties agree that if Plaintiff's federal common law nuisance claim fails, the Court would

27   be precluded from exercising supplemental jurisdiction over Plaintiff's state law nuisance claim.

28   The absence of a "sufficiently substantial federal claim" precludes a court from exercising

supplemental jurisdiction over pendent state-law claims.  *See, e.g., Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 421 (9th Cir. 1991).  The Ninth Circuit has held that district courts should decline to exercise supplemental over pendent claims when all federal claims are dismissed before trial.  *See e.g., Acri v. Varian Associates, Inc.*, 114 F.3d 999, 1000 (9th Cir. 1997) (en banc).  Accordingly, the Court **GRANTS** Defendants' motion as to Plaintiff's public nuisance cause of action under California Civil Code § 3479, *et seq.* and California Civil Code § 731, and **DISMISSES** Plaintiff's state-law claim **WITHOUT PREJUDICE** to refiling in state court.

### CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' motion.

**IT IS SO ORDERED.**

Dated: September 17, 2007

_____
MARTIN J. JENKINS
UNITED STATES DISTRICT JUDGE

**United States District Court**
For the Northern District of California